UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| ANGEL RUIZ | ) |
| Plaintiff, | ) |
| v. | )   Case No. 17-cv-02216 (VEC) |
| KERATIN BAR | ) |
| Defendant. | ) |

## CERTIFICATE OF SERVICE

I hereby certify that on this 3rd day of July 2017, I caused to be sent via regular first class postage, a copy of the foregoing Notice of Motion to Dismiss, Memorandum of Points and Authorities, Notice pursuant to Local Rules 12.1 and 56.2, copies of unpublished case authorities, and proposed order, to:

Angel Ruiz
1 Metropolitan Oval
Apartment 3E
Bronx, N.Y.  10462

Dated: July 3, 2017

Respectfully submitted,

*/s/ Lisa Alexis Jones*
Lisa Alexis Jones, Esq.
Lisa Alexis Jones, PLLC
1 Rockefeller Plaza, 10th Floor
New York, N.Y.  10020
(646) 756-2967
(888) 755-6778 (Fax)
ljones@lisaajones.com

*Counsel for Defendant Keratin Bar*



DEFENDANT'S
EXHIBIT

1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| ANGEL RUIZ <br><br> Plaintiff, <br><br> v. <br><br> KERATIN BAR <br><br> Defendant. | Case No. 17-cv-02216 (VEC) <br><br> **NOTICE TO PRO SE LITIGANT** |

### <u>Notice to Pro Se Litigant Who Opposes a Rule 12 Motion Supported by Matters Outside the Pleadings</u>

The defendant in this case has moved to dismiss or for judgment on the pleadings pursuant to Rule 12(b) or 12(c) of the Federal Rules of Civil Procedure, and has submitted additional written materials. This means that the defendant has asked the Court to decide this case without a trial, based on these written materials. You are warned that the Court may treat this motion as a motion for summary judgment under Rule 56 of the Federal Rules of Civil Procedure. For this reason, THE CLAIMS YOU ASSERT IN YOUR COMPLAINT MAY BE DISMISSED WITHOUT A TRIAL IF YOU DO NOT RESPOND TO THIS MOTION ON TIME by filing sworn affidavits as required by Rule 56(c) and/or other documents. The full text of Rule 56 of the Federal Rules of Civil Procedure is attached. In short, Rule 56 provides that you may NOT oppose the defendant's motion simply by relying upon the allegations in your complaint. Rather, you must submit evidence, such as witness statements or documents, countering the facts asserted by the defendant and raising specific facts that support your claim. If you have proof of your claim, now is the time to submit it. Any witness statements must be in the form of affidavits. An affidavit is a sworn statement of fact based on personal knowledge



stating facts that would be admissible in evidence at trial. You may submit your own affidavit and/or the affidavits of others. You may submit affidavits that were prepared specifically in response to defendant's motion. If you do not respond to the motion on time with affidavits and/or documents contradicting the facts asserted by the defendant, the Court may accept defendant's facts as true. Your case may be dismissed and judgment may be entered in defendant's favor without a trial. If you have any questions, you may direct them to the Pro Se Office.



Cornell Law School

Federal Rules of Civil Procedure › TITLE VII. JUDGMENT › Rule 56. Summary Judgment

# Rule 56. Summary Judgment

(a) Motion for Summary Judgment or Partial Summary Judgment. A party may move for summary judgment, identifying each claim or defense — or the part of each claim or defense — on which summary judgment is sought. The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. The court should state on the record the reasons for granting or denying the motion.

(b) Time to File a Motion. Unless a different time is set by local rule or the court orders otherwise, a party may file a motion for summary judgment at any time until 30 days after the close of all discovery.

(c) Procedures.

(1) Supporting Factual Positions. A party asserting that a fact cannot be or is genuinely disputed must support the assertion by:

(A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or

(B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

(2) Objection That a Fact Is Not Supported by Admissible Evidence. A party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence.

(3) Materials Not Cited. The court need consider only the cited materials, but it may consider other materials in the record.

(4) Affidavits or Declarations. An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated.

(d) When Facts Are Unavailable to the Nonmovant. If a nonmovant shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition, the court may:

(1) defer considering the motion or deny it;

(2) allow time to obtain affidavits or declarations or to take discovery; or

(3) issue any other appropriate order.

(e) Failing to Properly Support or Address a Fact. If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may:

(1) give an opportunity to properly support or address the fact;

(2) consider the fact undisputed for purposes of the motion;

(3) grant summary judgment if the motion and supporting materials — including the facts considered undisputed — show that the movant is entitled to it; or

(4) issue any other appropriate order.

(f) Judgment Independent of the Motion. After giving notice and a reasonable time to respond, the court may:

(1) grant summary judgment for a nonmovant;

(2) grant the motion on grounds not raised by a party;or

(3) consider summary judgment on its own after identifying for the parties material facts that may not be genuinely in dispute.

(g) Failing to Grant All the Requested Relief. If the court does not grant all the relief requested by the motion, it may enter an order stating any material fact — including an item of damages or other relief — that is not genuinely in dispute and treating the fact as established in the case.

(h) Affidavit or Declaration Submitted in Bad Faith. If satisfied that an affidavit or declaration under this rule is submitted in bad faith or solely for delay, the court — after notice and a reasonable time to respond — may order the submitting party to pay the other party the reasonable expenses, including attorney's fees, it incurred as a result. An offending party or attorney may also be held in contempt or subjected to other appropriate sanctions.

(As amended Dec. 27, 1946, eff. Mar. 19, 1948; Jan. 21, 1963, eff. July 1, 1963; Mar. 2, 1987, eff. Aug. 1, 1987; Apr. 30, 2007, eff. Dec. 1, 2007; Mar. 26, 2009, eff. Dec. 1, 2009; Apr. 28, 2010, eff. Dec. 1, 2010.)

N. tes of Advisory Committee on Rules—1937

This rule is applicable to all actions, including those against the United States or an officer or agency thereof.

UNITED STATES DISTRICT COURT EASTERN DISTRICT OF NEW YORK

11-CV-5155 (NGG) (VVP) (E.D.N.Y. Sep. 3, 2015)

# ⊞ SOSA V. N.Y. STATE DIV. OF HUMAN RIGHTS



---

NICHOLAS G. GARAUFIS, United States District Judge.

# MEMORANDUM & ORDER

NICHOLAS G. GARAUFIS, United States District Judge.

Pro se Plaintiff Roxana Sosa brings this employment discrimination action against Defendant New York State Division of Human Rights ("DHR") for violations of the Rehabilitation Act of 1972, 29 U.S.C. § 791 (/statute/29-usc-791-employment-of-individuals-with-disabilities) et seq.[1] (/case/sosa-v-ny-state-div-of-human-rights#idm140649930201840) (See Compl. (Dkt. 1).) Sosa alleges that DHR discriminated against her on the basis of disability when she was not promoted to an open position at DHR and again when she was placed on leave and ultimately terminated. (Id.) She further alleges that DHR failed to accommodate her disability and subjected her to a hostile work environment. (Id.) With leave of the court (see Sept. 8, 2014, Order (Dkt. 68)), DHR moved for summary judgment on all of Sosa's remaining claims (Not. of Mot. for Summ. J. (Dkt. 71)). For the reasons discussed below, DHR's motion for summary judgment is GRANTED in its entirety.

1. Sosa also brought claims against Jose Gonzalez and Joyce Yearwood-Drury, and claims under 42 U.S.C. § 1985 (/statute/42-usc-1985-conspiracy-to-interfere-with-civil-rights). Those claims were dismissed. (See Mar. 26, 2013, Mem. & Order (Dkt. 20).)

# I. BACKGROUND

## A. Factual Background



ALL-STATE LEGAL® DEFENDANT'S EXHIBIT 3

Except as otherwise noted, the following facts are undisputed. Where facts are in dispute, the court credits Sosa's version of the particular fact, if supported by record evidence.[2] (/case/sosa-v-ny-state-div-of-human-rights#idm140649930169120) The court has not included in this section facts introduced by the parties that are not material to Sosa's claims.

> 2.  Because Sosa is proceeding pro se, the court has performed an independent review of the entire record submitted by the parties to determine whether there are disputed issues of material fact. See McClendon v. Cnty. of Nassau, No. 11-CV-0190 (SJF) (ETB), 2012 WL 4849144, at *2 (E.D.N.Y. Oct. 11, 2012); Williams v. City of New York, No. 06-CV-6601 (NGG), 2009 WL 3254465, at *1 n.1 (E.D.N.Y. Oct. 9, 2009). Likewise, the court will consider Sosa's filings to be sworn statements so long as they are otherwise admissible. See Washington v. William Morris Endeavor Entm't, LLC, No. 10-CV-9647 (PKC), 2014 WL 4401291, at *1 n.1 (S.D.N.Y. Sept. 5, 2014); Geldzahler v. N.Y. Med. Coll., 746 F. Supp. 2d 618, 620 (/case/geldzahler-v-new-york-medical-college#p620) n.1 (S.D.N.Y. 2010).

## 1. Sosa's Employment History

In September 2001, Sosa was hired by DHR as a Human Rights Specialist I (Spanish Language). (Tr. of May 8, 2014, Dep. of Roxana C. Sosa ("Sosa Dep.") (Affirmation of Roxana C. Sosa in Opp'n of Def.'s Mot. for Summ. J. ("Sosa. Aff.") (Dkt. 79), Ex. D (Dkt. 79-4)) at 34:8-16.) On or about May 29, 2008, Sosa was provisionally promoted to the position of Human Rights Specialist II (HSR II) in DHR's Office of Sexual Harassment Issues ("OSHI"). (Def.'s Statement of Undisputed Facts Pursuant to Local Rule 56.1 ("DHR's 56.1") (Dkt. 72) ¶ 3; Pl. Pro Se's Response to Def.'s Statement of Undisputed Facts Pursuant to Local Rule 56.1 ("Sosa's 56.1") (Dkt. 78) ¶ 3.)[3] (/case/sosa-v-ny-state-div-of-human-rights#idm140649932192320) Provisional employees are hired without taking a civil service exam and serve at-will, for a limited term. (DHR's 56.1 ¶ 4; Sosa's 56.1 ¶ 4.)[4] (/case/sosa-v-ny-state-div-of-human-rights#idm140649935174288) [3]

> 3.  It appears that Sosa served only one document labeled both her opposition and 56.1 statement. Because Sosa is appearing pro se, the court has construed this document liberally. Sosa's 56.1 statement contains multiple paragraphs designated paragraph three. Here, the court refers to the third paragraph labeled "three".

> 4.  Sosa's 56.1 statement contains multiple paragraphs designated paragraph four. Here, the court refers to the first and second paragraphs labeled "four."

## 2. Sosa's Injuries

On September 30, 2008, Sosa slipped and fell outside of a bathroom at OSHI. (DHR's 56.1 ¶ 5; Sosa's 56.1 ¶ 5.)[5] (/case/sosa-v-ny-state-div-of-human-rights#idm140649935967984) Sosa suffered extensive injuries in the fall which led to headaches and blurred visions. (Employee Accident Report (Sosa Aff., Ex. E (Dkt. 79-5)) at 1-2; Comprehensive Initial Evaluation (Sosa Aff., Ex. F (Dkt. 79-6)) at 3-4.) On November 4, 2008, Sosa submitted an Employee Accident Report which was signed by her supervisor, Ms. Joyce Yearwood-Drury.

(Employee Accident Report at 1-2.) On January 31, 2009, Sosa was involved in a car accident. (ExitCare Patient Information Dated Jan. 31, 2009 (Sosa Aff., Ex. G (Dkt. 79-7)) at 1.) The car accident exacerbated Sosa's symptoms. (Sosa Dep. (Affirmation of Michelle R. Lambert in Support of Def.'s for Mot. Summ. J. ("Lambert Aff.") (Dkt. 76), Ex. D (Dkt. 76-4)) at 81:16-19.)

> 5. Sosa's 56.1 statement contains multiple paragraphs designated paragraph five. Here, the court refers to the second paragraph labeled "five".

Sosa's injuries required that she receive medical care and physical therapy multiple times per week and at various times throughout the day. (DHR's 56.1 ¶ 7; Sosa's 56.1 ¶ 7.) The parties contest the extent to which Sosa's medical condition was accommodated by DHR. (Compare DHR's 56.1 ¶ 8, with Sosa's 56.1 ¶ 8.) At this stage of the litigation, the court credits Sosa's evidence. Sosa's evidence indicates that because OSHI was understaffed, it was often difficult for Sosa to attend her medical appointments. (Sosa Dep. at 106:24-107:8, 183:18-25.) Nonetheless, Sosa was never denied leave to attend a medical appointment; indeed, it appears that each time she requested leave, it was approved. (Decl. of Joyce Yearwood-Drury in Support of Def.'s Mot. for Summ. J. ("Yearwood-Drury Decl.") (Dkt. 74) ¶ 13.) However, when Sosa used leave, Yearwood-Drury carefully scrutinized her time sheets (Sosa Dep. at 210:19-211:5; see also id. at 154:21-155:16 (indicating that Yearwood-Drury was less conscientious regarding other employee's timesheets)), and was often late in approving Sosa's timesheets (id. at 207:10-14). In addition, on at least one occasion, Yearwood-Drury screamed at Sosa and accused her of not being truthful in her time reports. (Id. at 92:25-93:14.)

Sosa further claims that she was mistreated at OSHI. Specifically, Sosa claims that Yearwood-Drury sent Barbara Feldstein, another OSHI employee, to harass her (id. at 93:9-17, 122:16-25), and then refused to respond appropriately when Sosa complained about the harassment (id. at 154:8-155:25).

### 3. Sosa's Attempt to Become a Permanent HSR II

On or about October 16, 2010, Sosa took the civil service exam for a permanent HRS II position. (DHR's 56.1 ¶ 9; Sosa's 56.1 ¶ 9.) In January of 2011, the civil service list for the HRS II position was certified. (DHR's 56.1 ¶ 10; Sosa's 56.1 ¶ 10; List 36327, Human Rights Specialist 2 (Sosa Aff., Ex. S (Dkt. 79-19)) at 1-4.) Sosa scored an 80 on the exam. (DHR's 56.1 ¶ 11; Sosa's 56.1 ¶ 11.) Numerous candidates scored higher than Sosa, including multiple candidates who scored either a 95, 90, or an 85. (List 36327, Human Rights Specialist 2, at 1-4.)

By way of background, New York's Civil Service law provides that "[a]ppointment or promotion from an eligible list to a position in the competitive class shall be made by the selection of one of the three persons certified by the appropriate civil service commission as standing highest on such eligible list who are willing

to accept such appointment or promotion." N.Y. Civ. Serv. Law § 61(1). Sosa (/statute/ny-civ-serv-law-61-appointment-and-promotion) argues that this particular appointment did not require the appointment of a candidate from the top three scoring candidates who were are willing to accept the appointment. (Sosa's 56.1 ¶ 12.) However, a reasonable jury could not so infer from any evidence in the record; the record evidence indicates that DHR debated how to treat candidates ·₅who received the same exam score. (Mar. 11, 2011, Email from Jose Gonzalez to Jyll Townes (Sosa Aff., Ex. T (Dkt. 79-20)) at 1-2; Mar. 10, 2011, Email from Galen Kirkland to Jose Gonzalez (Sosa Aff., Ex. V (Dkt. 79-22)) at 2-3.) DHR did not consider candidates who received lower scores until there were fewer than three candidates remaining with higher scores. (Mar. 11, 2011, Email from Jose Gonzalez to Jyll Townes (Sosa Aff., Ex. T (Dkt. 79-20)); Decl. of Ali Jafri in Support of Def.'s Mot. for Summ. J. ("Jafri Decl.") (Dkt. 73) ¶¶ 11, 12.)

Sosa was not interviewed for the position at OSHI. (DHR's 56.1 ¶ 13; Sosa's 56.1 ¶ 13.) Sosa was not eligible because four candidates who ranked higher than her expressed interest in the position. (DHR's 56.1 ¶ 13; Jafri Decl.¶ 12.) Sosa contests that four candidates actually expressed interest; specifically, Sosa alleges that there is insufficient evidence that William Plotski was interested in the position. (Sosa's 56.1 ¶ 13.) Sosa has not presented evidence that raises a genuine issue of material fact regarding the number of employees who expressed interest in the position. Sosa claims that the evidence indicates Plotski was on a long-term leave of absence and therefore not interested in the position. (Id.) A rational jury could not make such an inference. Sosa's evidence indicates that five employees were on sick leave. (Aug. 31, 2011, Email from Jill Townes to Luis Burgos (Sosa Aff., Ex. U (Dkt. 79-21)).) But the record does not indicate that one of the five employees was Plotski; much less that Plotski was unwilling to return to work. (Id.)

Based on her score, Sosa was reachable—that is she was within the top three candidates—for an HRS II position at the Upper Manhattan Regional office because only two candidates with scores higher than hers expressed interest in that particular position. (Def.'s 56.1 ¶ 14; Sosa's 56.1 ¶ 14.) Sosa was interviewed for the position in March of 2011. (Def.'s 56.1 ¶ 15; Sosa's 56.1 ¶ 15.) All the interview questions were pre-planned and each candidate was ·₆ asked the same questions. (Yearwood-Drury Decl. ¶ 16; Decl. of David Powell in Support of Def.'s Mot. for Summ. J. ("Powell Decl.") (Dkt. 75) ¶ 4.) Sosa claims that she received insufficient notice of the interview and that Yearwood-Drury was "completely unprofessional" during the interview. (Sosa's 56.1 ¶ 15)[6] (/case/sosa-v-ny-state-div-of-human-rights#idm140649933645088)

---

6. Sosa's 56.1 statement contains multiple paragraphs designated paragraph fifteen. Here, the court refers to the second and third paragraphs labeled "fifteen".

Ultimately, Janne Linares was hired for the position. (DHR's 56.1 ¶ 16; Sosa's 56.1 ¶ 16.) Linares was hired upon the recommendation of David Powell, who had supervised Linares for more than two years in the Upper Manhattan Regional Office. (Id.) Conversely, Sosa's supervisor, Yearwood-Drury, did not recommend that Sosa be appointed to the position. (Sosa Dep. at 247:21-249:15.) At the time of the interview, Powell did not know about Sosa's disability. (DHR's 56.1 ¶ 17; Sosa's 56.1 ¶ 17.)

On March 31, 2011, DHR sent Sosa a letter informing her that because she did not score high enough on the HRS II exam, she was being reverted back to her permanent position as an HRS I (Spanish Language). (Sosa's 56.1 ¶ 19.)[7] (/case/sosa-v-ny-state-div-of-human-rights#idm140649933034464)

> 7.  Sosa's 56.1 statement contains multiple paragraphs designated paragraph nineteen. Here, the court refers to the second paragraph labeled "nineteen".

### 4. Sosa's Medical Leave

On April 1, 2011, Sosa called in sick and did not report to work. (DHR's 56.1 ¶ 20; Sosa's 56.1 ¶ 20.) On April 29, 2011, DHR approved Sosa for sick leave with half-pay. (DHR's 56.1 ¶ 21; Sosa's 56.1 ¶ 21.) Over the next several months, Sosa's sick leave was extended three times, through August 19, 2011. (DHR's 56.1 ¶ 22; Sosa's 56.1 ¶ 22.) On August 17, 2011, DHR sent Sosa a letter requesting that she submit to a medical examination; the examination was scheduled for August 25, 2011. (DHR's 56.1 ¶ 23; Sosa's 56.1 ¶ 23; Aug. 17, 2011, Letter (Jafri Decl. Ex. H (Dkt. 73-8)).) On August 24, 2011, DHR sent Sosa a ¬7 letter rescheduling the medical examination for August, 31, 2011. (Aug. 24, 2011, Letter (Jafri Decl., Ex. I (Dkt. 73-9)).) Sosa did not attend the medical examination on the advice of her counsel. (Sosa's 56.1 ¶¶ 23, 24; Sosa Dep. at 12:6-14, 285:8-286-21.) On September 8, 2011, DHR sent Sosa a letter informing her that she had been placed on unauthorized leave without pay for failure to appear at the medical examination. (DHR's 56.1 ¶ 25; Sosa's 56.1 ¶ 25.) On September 3, 2013, Sosa received a letter from DHR which stated that her employment would be terminated if she did not appear at work on or before September 12, 2013. (Sosa's 56.1 ¶ 26; Jafri Decl. ¶ 27.) Sosa did not respond to the September 3, 2013, letter and did not return to work; accordingly, her employment was terminated. (Jafri Decl. ¶ 28.)

### B. Procedural History

On October 21, 2011, Sosa filed the Complaint, alleging disability discrimination and harassment under the Rehabilitation Act against DHR, and conspiracy to interfere with civil rights against DHR, Gonzalez, and Yearwood-Drury. (Compl.) On June 15, 2012, Defendants moved to dismiss all of the claims. (Not. of Mot. (Dkt. 13).) The court denied Defendants' motion with respect to the Rehabilitation Act claim, but granted Defendants' motion and dismissed the conspiracy to interfere with civil rights claim. (Mar. 26, 2013, Mem. &

Order (Dkt. 20).) On September 5, 2014, DHR sought leave to move for summary judgment. (Ltr. Mot. for Pre-Mot. Conf. (Dkt. 67).) The court granted DHR's request. (Sept. 8, 2014, Order.) Now before the court now is DHR's motion for summary judgment on Sosa's Rehabilitation Act claims.

# *8 II. LEGAL STANDARDS

## A. Summary Judgment

Summary judgment must be granted when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). A fact is material if it "might affect the outcome of the suit under the governing law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (/case/anderson-v-liberty-lobby-inc#p248) (1986). No genuine dispute of material fact exists if "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (/case/matsushita-electric-industrial-co-ltd-v-zenith-radio-corporation#p587) (1986). In evaluating a motion for summary judgment, the court "is required to construe the evidence in the light most favorable to the non-moving party and to draw all reasonable inferences in its favor." Trammell v. Keane, 338 F.3d 155, 161 (/case/trammell-v-keane#p161) (2d Cir. 2003); see also Anderson, 477 U.S. at 255 (/case/anderson-v-liberty-lobby-inc#p255) ("The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor.").

The moving party bears the initial burden to show an absence of genuine factual dispute. See Adickes v. S. H. Kress & Co., 398 U.S. 144, 157 (/case/adickes-v-kress-company#p157) (1970). Summary judgment will be granted if the opposing party then "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (/case/celotex-corporation-v-catrett#p322) (1986). To defeat summary judgment, the opposing party must do more than demonstrate "some metaphysical doubt as to the material facts," Matsushita, 475 U.S. at 586 (/case/matsushita-electric-industrial-co-ltd-v-zenith-radio-corporation#p586), and may not rely on "conclusory allegations," Twin Labs., Inc. v. Weider Health & Fitness, 900 F.2d 566, 568 (/case/twin-laboratories-v-weider-health-fitness#p568) (2d Cir. 1990). Where the party opposing summary judgment is proceeding pro se, the court must construe his filings liberally. See Ferran v. Town of Nassau, 471 F.3d 363, 369 (/case/ferran-v-town-of-nassau-2#p369) (2d Cir. 2006). *9

## B. Rehabilitation Act

The Rehabilitation Act provides in relevant part:

> No otherwise qualified individual with a disability in the United States . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance . . . .

29 U.S.C. § 794(a) (/statute/29-usc-794-nondiscrimination-under-federal-grants-and-programs). "To establish a prima facie case under the Rehabilitation Act, a plaintiff must show: (1) he is handicapped or disabled under the Act; (2) he is otherwise qualified to perform his job; (3) he suffered an adverse employment action solely due to his disability; and (4) the employer is a recipient of Federal financial assistance." Gentile v. Potter, 509 F. Supp. 2d 221, 235 (/case/gentile-v-potter#p235) (E.D.N.Y. 2007); see also Fulton v. Goord, 591 F.3d 37, 43 (/case/fulton-v-goord-2#p43) (2d Cir. 2009). "To be materially adverse, a change in working conditions must be more disruptive than a mere inconvenience or an alteration of job responsibilities." Sanders v. N.Y.C. Human Res. Admin., 361 F.3d 749, 755 (/case/sanders-v-ny-city-human-resources-admin#p755) (2d Cir. 2004) (internal quotation marks and citation omitted). "Examples of materially adverse employment actions include termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices unique to a particular situation." Sethi v. Narod, 12 F. Supp. 3d 505, 523 (/case/sethi-v-randy-narod-erica-lee-deborah-morrissey-cambridge-whos-who-publg-inc#p523) (E.D.N.Y. 2014) (citing Feingold v. New York, 366 F.3d 138, 152 (/case/feingold-v-new-york#p152) (2d Cir. 2004)). Likewise, the failure to promote may be a materially adverse employment action. Mills v. S. Conn. State Univ., 519 F. App'x 73, 75 (/case/mills-v-s-conn-state-univ#p75) (2d Cir. 2013) (summary order).

Courts in this circuit routinely rely on jurisprudence under the Americans with Disabilities Act ("ADA") to inform their analysis under the Rehabilitation Act because "[a]part from the Rehabilitation Act's limitation to denials of benefits 'solely' by reason of disability and its reach of only federally funded—as opposed to 'public'—entities, the reach and requirements ‎10 of both statutes are precisely the same." Weixel v. Bd. of Educ. of City of N.Y., 287 F.3d 138, 146 (/case/weixel-v-board-of-educ-of-city-of-new-york#p146) n.6 (2d Cir. 2002); see also Logan v. Matveevski, 57 F. Supp. 3d 234, 254 (/case/logan-v-matveevskii-2#p254) (S.D.N.Y. 2014) ("These appear to be the only significant differences between the ADA and the Rehabilitation Act.").

1. Discriminatory Treatment

Claims of intentional discrimination under the Rehabilitation Act are analyzed under the burden-shifting framework established by the Supreme Court in McDonnell Douglass Corp. v. Green, 411 U.S. 792 (/case/mcdonnell-douglas-corporation-v-green)(1973). See Reg'l Econ. Cmty. Action Program, Inc. v. City of Middletown, 294 F.3d 35, 48-49 (/case/reg-economic-community-v-city-of-middletown#p48) (2d Cir. 2002) superseded by statute on other grounds, ADA Amendments of 2008, Pub. L. No. 110-325, 122 Stat. 3553. Under the McDonnell Douglass framework, a plaintiff must first establish a prima facie case of discrimination. See City of Middletown, 294 F.3d at 49 (/case/reg-economic-community-v-city-of-middletown#p49). In order to make out a prima facie case of intentional discrimination a plaintiff must demonstrate: (1) she is a handicapped person; (2) she is otherwise qualified to perform her job; (3) the adverse employment action was taken because of her handicap; and (4) the employer is a recipient of Federal funding. Heilweil v. Mount Sinai Hosp., 32 F.3d 718, 722 (/case/heilweil-v-mount-sinai-hosp#p722) (2d Cir. 1994); see also City of Middletown, 294 F.3d at 49 (/case/reg-economic-community-v-city-of-middletown#p49). ("To establish a prima facie case of discrimination under the Rehabilitation Act, . . . the plaintiffs must show that the defendants [took an adverse employment action] 'solely' because of the disability.").

If a plaintiff can successfully make out a prima facie case, the burden of production then shifts to the defendant to "articulate (not prove), via admissible evidence, a legitimate reason for the employment decision." Tyler v. Bethlehem Steel Corp., 958 F.2d 1176, 1180 (/case/tyler-v-bethlehem-steel-corp#p1180) (2d Cir. 1992); City of Middletown, 294 F.3d at 49 (/case/reg-economic-community-v-city-of-middletown#p49). Finally, "[t]he plaintiffs must then prove that the defendants 'n intentionally discriminated against them on a prohibited ground." City of Middletown, 294 F.3d at 49 (/case/reg-economic-community-v-city-of-middletown#p49).

2. Hostile Work Environment

"A hostile work environment claim arises 'when the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" Lucenti v. Potter, 432 F. Supp. 2d 347, 361 (/case/lucenti-v-potter#p361) (S.D.N.Y. 2006) (quoting Harris v. Forklift Sys., Inc., 510 U.S. 17, 21 (/case/harris-v-forklift-systems-inc#p21) (1993)). "Conduct that is not severe or pervasive enough to create an objectively hostile or abusive work environment—an environment that a reasonable person would find hostile or abusive" does not rise to the level of a hostile work environment. Harris, 510 U.S. at 21 (/case/harris-v-forklift-systems-inc#p21). The Supreme Court has noted that "whether an environment is

'hostile' or 'abusive' can be determined only by looking at all the circumstances"; nonetheless, the court recognized that certain factors may guide the inquiry including: "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." Id. at 23.

Accordingly, "hostile work environment claims present mixed questions of law and fact that are especially well-suited for jury determination." Messer v. Fahnestock & Co. Inc., No. 03-CV-4989 (ENV) (JMA,) 2008 WL 4934608, at *8 (/case/messer-v-fahnestock-co-inc#p8) (E.D.N.Y. Nov. 18, 2008) (internal quotation marks and citations omitted). Nonetheless, "it is the law of this Circuit that 'summary judgment remains available for the dismissal of discrimination claims in cases lacking genuine issues of material fact.'" Schiano v. Quality Payroll Sys., Inc., 445 F.3d 597, 608 (/case/schiano-v-quality-payroll-systems-inc#p608) (2d Cir. 2006) (quoting McLee v. Chrysler Corp., 109 F.3d 130, 135 (/case/mclee-v-chrysler-corporation#p135) (2d Cir. 1997)). [12]

### 3. Reasonable Accommodation

Under the Rehabilitation Act, "an employer discriminates by, inter alia, not making a 'reasonable accommodation to the known physical or mental limitations' of an otherwise qualified employee, unless the employer can demonstrate that the accommodation would impose 'an undue hardship' on the operation of its program." Alenski v. Potter, 03-CV-2179 (SJF) (MLO), 2005 WL 1309043, at *14 (E.D.N.Y. May 18, 2005) (adopting report and recommendation) (quoting 45 C.F.R. § 84.12(a) (/regulation/45-cfr-8412-reasonable-accommodation)). "Quite simply, the demonstration that a disability makes it difficult for a plaintiff to access benefits that are available to both those with and without disabilities is sufficient to sustain a claim for a reasonable accommodation." Henrietta D. v. Bloomberg, 331 F.3d 261, 277 (/case/henrietta-d-v-bloomberg#p277) (2d Cir. 2003).

"A 'reasonable accommodation' is one that gives the otherwise qualified plaintiff with disabilities 'meaningful access' to the program or services sought." Id. at 282 (quoting Alexander v. Choate, 469 U.S. 287, 301 (/case/alexander-v-choate#p301) (1985)). "Whether a requested accommodation is required . . . is highly fact-specific, requiring case-by-case determination." Logan v. Matveevskii, 57 F. Supp. 3d 234, 256 (/case/logan-v-matveevskii-2#p256) (S.D.N.Y. 2014) (alteration in original) (citing Freeland v. Sisao LLC, No. 07-CV-3741 (CPS) (SMG) 2008 WL 906746, at *3 (E.D.N.Y. Apr. 1, 2008)). "[A]n accommodation is reasonable only if its costs are not clearly disproportionate to the benefits that it will produce." Borkowski v. Valley Cent. Sch. Dist., 63 F.3d 131, 138 (/case/borkowski-v-valley-cent-school-dist#p138) (2d Cir. 1995).

# III. DISCUSSION

## A. Discriminatory Treatment

A generous reading of the Complaint and Sosa's 56.1 statement reveals four potential adverse employment events: (1) DHR's failure to promote Sosa to the OSHI HRS II position; (2) [13] DHR's failure to promote Sosa to the Upper Manhattan Regional Office HRS II position; (3) Sosa's reversion to an HRS I position; and (4) Sosa's placement on unpaid leave. The court examines each in turn.[8] (/case/sosa-v-ny-state-div-of-human-rights#idm140649930937712)

> 8.  For the purposes of this motion, DHR does not contest that Sosa is disabled under the Rehabilitation Act, or that DHR receives federal funding. (Mem. in Support of Def.'s Mot. for Summ. J. (Dkt. 77) at 9 n.9.)

### 1. OSHI HRS II Position

DHR argues that Sosa cannot make out a claim for discriminatory treatment with regard to the OSHI position because "by law, Plaintiff was not qualified for the position" and because four interested individuals scored higher. (Mem. in Support of Def.'s Mot. for Summ. J. ("DHR's Mem.") (Dkt. 77) at 11.)

The court agrees; a reasonable jury could not find that Sosa was denied the HRS II position at OSHI solely because of her disability for two reasons: (1) she is not qualified for the OSHI HRS II position, and (2) there is no evidence that Sosa was more qualified than the individual who was hired.

"The Second Circuit [has held] that in determining whether a plaintiff has met his prima facie burden of demonstrating he was qualified for a position, 'being qualified refers to the criteria the employer has specified for the positions,' and a plaintiff's subjective belief he is qualified will not suffice." Workneh v. Pall Corp., 897 F. Supp. 2d 121, 131 (/case/workneh-v-pall-corp#p131) (E.D.N.Y. 2012) (quoting Williams v. R.H. Donnelly Corp., 369 F.3d 123, 127 (2d Cir. 2004)). By operation of state law, Sosa could not be hired as an HRS II at OSHI, see N.Y. Civil Service Law § 61 (/statute/ny-civ-serv-law-61-appointment-and-promotion), because four individuals with higher scores than Sosa were interested in the position (Jafri Decl. ¶ 12); see also supra Part I.A.3. Accordingly, Sosa was not an otherwise qualified individual. See Hall v. N.Y.C. Dep't of Transp., 701 F. Supp. 2d 318, 334 (/case/hall-v-new-york-city-dept-of-transp#p334) (E.D.N.Y. 2010) (dismissing a failure to promote claim where the plaintiff was not qualified under the New York Civil Service [14] Law); As-Salaam v. N.Y.C. Dep't of Parks & Recreation, No. 02-CV-5646 (ENV) (LB), 2007 WL 2126262, at *6 (E.D.N.Y. July 24, 2007) ("Crucially, As-Salaam fails even to offer proof that he was legally 'qualified' for the position. Indeed, his own recitation of the facts establishes conclusively that, as a result of his own reckless disregard of work-related mail, he failed to complete the requirements for permanent

competitive appointment to the Civil Service position of climber and pruner he had provisionally held and, as a matter of New York public law, was therefore no longer 'qualified' to keep his position upon the appointment of a certified candidate to fill it."); cf. Manessis v. N.Y.C. Dep't of Transp., No. 02-CV-359 (SAS), 2003 WL 289969, at *10 (/case/manessis-v-new-york-city-department-of-transportation#p10) (S.D.N.Y. Feb. 10, 2003) (noting that plaintiff was not similarly situated to individuals who were reachable on the civil service list), aff'd sub nom. Manessis v. Chasin, 86 F. App'x 464 (2d Cir. 2004) (summary order).[9] (/case/sosa-v-ny-state-div-of-human-rights#idm140649931900912)

> 9.  This is not to say that the exam process is insulated from review under federal civil rights law. Indeed, it is a cognizable claim under the civil rights statutes that an exam is itself discriminatory. Here, however, Plaintiff has not alleged that the HRS II examination was discriminatory in any way.

Even if Sosa could show that she was qualified (i.e. that she should have been reachable on the list) she could still not make out a prima facie case because there is no evidence that Sosa was more qualified than— or even as qualified as—Roberto Chavez, the candidate who was ultimately hired.

In the failure-to-promote context, a comparison of the plaintiff's qualifications to those of the promoted employee is appropriate at the prima facie stage. See Anyanwu v. City of New York, No. 10-CV-8498 (AJN) (THK), 2013 WL 5193990, at *14 (S.D.N.Y. Sept. 16, 2013) (surveying failure-to-promote case law and explaining that "the Second Circuit appears to require at least some comparison of the plaintiff's qualifications with those of the promoted employee(s) at the prima facie stage." (citing Mandell v. Cnty. of Suffolk, 316 F.3d 368, 379 (/case/mandell-v-county-of-suffolk#p379) (2d Cir. 2002); Terry v. Ashcroft, 336 F.3d 128, 139 (/case/terry-v-ashcroft#p139) (2d Cir. 2003)). But see, e.g., Byrnie v. *15 Town of Cromwell, 243 F.3d 93, 103 (/case/byrnie-v-town-of-cromwell-bd-of-educ#p103) (2d Cir. 2007) (holding, in failure-to-hire context, that plaintiff established prima facie case of age discrimination by showing only that "[h]e was a 64 year old male job applicant who . . . was eminently qualified for the art teacher position that [defendant] awarded to [a] 42 year old female . . . .") As the Anyanwu court explained:

> Indeed, comparing qualifications at the prima facie stage makes intuitive sense, because selecting another employee for promotion instead of the plaintiff involves choosing among multiple candidates. The mere fact that the plaintiff was qualified for the job—which is established as the second element of the prima facie case—says nothing about which candidate was more qualified. As a logical matter, only if a reasonable employer would have found the plaintiff to be significantly better qualified for the job, but this employer did not, [can] the factfinder . . . legitimately infer that the employer consciously selected a less-qualified candidate—something that employers do not usually do, unless some other strong consideration, such as discrimination, enters into the picture.

2013 WL 5193990, at *15 (alterations and emphases in original) (internal quotation marks and citation omitted). Here, the record reflects that Sosa was <u>less</u> qualified for the HRS II position than Chavez—indeed, the only evidence in the record is that Chavez scored better than Sosa on the civil service exam. <u>See, e.g., id.</u> at * 17 (plaintiff established prima facie case with respect to particular promotion where he showed that four employees selected over him for the promotion did not hold a relevant license held by plaintiff and were therefore less qualified for the position); <u>Gonzalez v. City of New York</u>, 354 F. Supp. 2d 327, 335 (/case/gonzalez-v-city-of-new-york-2#p335) (S.D.N.Y. 2005) (plaintiffs failed to establish prima facie case at summary judgment in failure-to-promote action where they offered no evidence that individuals who were promoted in their place were less qualified).

2. <u>Upper Manhattan Regional Office HRS II Position</u>

Similarly, Sosa cannot make out a prima facie claim that she was denied a promotion to the Upper Manhattan Regional Office HRS II position because of her disability. As with the '16 OSHI position, the record is devoid of any evidence that Linares, the candidate selected for the position, was less qualified than Sosa. True, Linares and Sosa scored the same on the civil service exam; but this does not end the analysis. (Jafri Decl. ¶ 12.) Linares had already worked for Powell, the supervisor of the Upper Manhattan Regional Office, as a provisional HRS II, and he believed that she "performed exceptionally." (Powell Decl. ¶ 6.) Accordingly, following the interview, Powell—who did not know that Sosa was disabled (DHR's 56.1 ¶ 17; Sosa's 56.1 ¶ 17)—concluded that "Linares was best suited for the HRS II position" (Powell Decl. ¶ 8). Sosa cannot make out a prima facie case on such a record. <u>See Gonzalez v. City of New York</u>, 354 F. Supp. 2d 327, 335 (/case/gonzalez-v-city-of-new-york-2#p335) (S.D.N.Y. 2005).

The court additionally finds that Yearwood-Drury's allegedly unprofessional behavior during the interview is insufficient to support at prima facie claim. Because the hiring decision was made on the basis of Powell's knowledge of Linares's work, Sosa has not raised a genuine issue of material fact indicating that Yearwood-Drury's allegedly unprofessional interview behavior played any role in her not being promoted to the Upper Manhattan Regional Office position.

Even if Sosa could make out a prima facie case, Sosa has not adduced any evidence that she was not promoted solely because of her disability. Sosa's theory appears to be that she was denied the position because Yearwood-Drury refused to recommend her. Even accepting that Yearwood-Drury's recommendation would have been dispositive, Sosa has not shown that Yearwood-Drury refused to give a recommendation because Sosa was disabled. Indeed, the record belies such a claim; Yearwood-Drury did not

make recommendations for open positions outside her office, the OSHI. (Yearwood-Drury Decl. ¶ 17.) Additionally, even if Yearwood-Drury would normally have made a recommendation, the record indicates ample neutral reasons [17] why she would not have recommended Sosa. In fact, Sosa admitted that she had "had disagreements" with Yearwood-Drury (Sosa Dep. at 248:24-249:3), and that Yearwood-Drury had questioned Sosa's managerial style (id. at 154:19-155:3).

Sosa's allegation that she received insufficient notice of her interview cannot revive her claim. The record contains no evidence indicating that Sosa's notice was delinquent compared to other candidates. Even assuming that Sosa did receive comparatively late notice, Sosa has failed to adduce any evidence that she received late notice because of her disability. Indeed, there is no indication that individuals who knew of Sosa's disability played any role in her receiving notice regarding the interview. On such a record, Sosa has not carried her burden of adducing evidence sufficient to create a genuine issue of material fact.

3. Reversion to HRS I

DHR argues that Sosa's reversion to her HRS I position was not discriminatory because it was required as a matter of state law. (DHR's Memo at 11.)

The court concurs. It is undisputed that Sosa only held her HRS II position provisionally. (DHR's 56.1 ¶ 3; Sosa's 56.1 ¶ 3.) It is likewise undisputed that in January 2011, a civil service list was certified for the HRS II position. (DHR's 56.1 ¶ 10; Sosa's 56.1 ¶ 10.) New York's Civil Service Law provides "[a] provisional appointment to any position shall be terminated within two months following the establishment of an appropriate eligible list for filling vacancies in such positions . . . ." N.Y. Civ. Serv. Law § 65(3). Accordingly (/statute/ny-civ-serv-law-65-provisional-appointments-authorized), Sosa was required to be reverted to her permanent position under New York law. (Mar. 31, 2011, Letter to Roxana Sosa (Jafri Decl. Ex. C (Dkt. 73-3)).)

Reversion pursuant to Civil Service Law § 65 is both legitimate and non-discriminatory. See, e.g., Valcin v. N.Y.C. Dep't of Homeless Servs., No. 07-CV-1385 (DAB) (KNF), 2009 [18] WL 3094873, at *6 (S.D.N.Y. Sept. 24, 2009) (report and recommendation) ("Inasmuch as the plaintiff had not taken the civil service examination, New York law required that DHS terminate her employment to fill her position with a qualified candidate from the eligible list. Accordingly, the defendant has met its burden of production by demonstrating a legitimate, non-discriminatory reason for Valcin's termination existed.") adopted, 2010 WL 1257603 (S.D.N.Y. Mar. 30, 2010); As-Salaam, 2007 WL 2126262, at *6 ("Quite simply, a provisional appointee is not permitted by law to hold a position in the civil service to the exclusion of a duly qualified candidate for that

position certified from the corresponding civil service eligibility list. In the absence of any indicia of discrimination whatsoever, the Court cannot find As-Salaam has demonstrated, even prima facie, that his statutorily mandated termination from the provisional position of climber and pruner was in violation of Title VII."); <u>Cabrera v. City of New York</u>, 436 F. Supp. 2d 635, 645 (/case/cabrera-v-nyc#p645) (S.D.N.Y. 2006) ("It is undisputed that after the establishment of the civil service list all provisional employees in Cabrera's title at Bellevue, regardless of age, race, or national origin, were terminated in reverse seniority order with the most junior employees being terminated first. All of the individuals who replaced the provisional employees were appointed from the established civil service list. As every provisional PAA had their provisional employment terminated, Cabrera has not established that her termination occurred under circumstances giving rise to an inference of discrimination."); <u>Wheeler v. Natale</u>, 137 F. Supp. 2d 301, 305 (/case/wheeler-v-natale-2#p305) (S.D.N.Y. 2001) ("Since plaintiff concedes that she did not pass the test and was therefore not listed upon the appropriate Civil Service list, plaintiff's employment, as a matter of law, had to come to an end. Plaintiff did not qualify for the Civil Service job, so she cannot allege a failure to hire, or 'adverse employment action' against the defendants as a result of this decision.") [19]

### 4. Unpaid Leave

DHR has proffered a legitimate non-discriminatory basis for its decision to terminate Sosa (DHR's Memo at 15); namely, Sosa was not entitled to leave without taking a required medical examination. (See Sept. 8, 2011, Letter to Roxana Sosa (Jafri Decl. Ex. J (Dkt. 73-10)).)[10] (/case/sosa-v-ny-state-div-of-human-rights#idm140649935791488) Sosa was required to attend the health examination under New York law.[11] (/case/sosa-v-ny-state-div-of-human-rights#idm140649925572208) N.Y. Comp. Codes R. & Regs. tit. 4, § 21.3 ("The appointing authority may require such proof of illness as may be satisfactory to it, or may require the employee to be examined, at the expense of the department or agency, by a physician designated by the appointing authority.") Indeed, Sosa was repeatedly informed that she was required to submit evidence substantiating the basis for her medical leave of absence (see, e.g., Apr. 29, 2011, Letter to Roxana Sosa (Jafri Decl. Ex. D (Dkt. 73-4)); May 18, 2011, Letter to Roxana Sosa (Jafri Decl. Ex. E (Dkt. 73-5)); June 23, 2011, Letter to Roxana Sosa (Jafri Decl. Ex. F (Dkt. 73-6)); July 14, 2011, Letter to Roxana Sosa (Jafri Decl. Ex. G (Dkt. 73-7))), and that she was required to attend a medical examination (Aug. 24, 2011, Letter to Roxana Sosa (Jafri Decl. Ex. I (Dkt. 73-9))). When Sosa failed to attend the medical examination, New York law permitted DHR to consider her absence [20] "as unauthorized leave", which cannot be counted as sick leave.

N.Y. Comp. Codes R. & Regs. tit. 4, § 21.3. Accordingly, DHR was permitted to place Sosa on an unpaid leave of absence for a period of up to two years. Id. § 21.1. This is precisely what DHR did. (Sept. 3, 2013, Letter to Roxana Sosa (Jafri Decl. Ex. K (Dkt. 73-11)).)

10. Sosa does not appear to challenge that the medical examination itself was unlawful. The ADA requires that for an agency to permissibly require a medical examination of an employee, it must show that the examination is job-related and consistent with business necessity. Krishnapillai v. Donahoe, No. 09-CV-1022 (NGG) (SMG), 2013 WL 5423724, at *18 (E.D.N.Y. Sept. 26, 2013). "[B]usiness necessities may include . . . cutting down on egregious absenteeism." Conroy v. N.Y. Dep't of Corr. Servs., 333 F.3d 88, 97-98 (/case/conroy-v-new-york-dept-of-correctional#p97) (2d. Cir. 2003). "The employer need not show that the examination or inquiry is the only way of achieving a business necessity, but the examination or inquiry must be a reasonably effective method of achieving the employer's goal." Id. at 98. Here, Sosa had been on half pay leave for over four months when DHR ordered a medical examination. DHR had a legitimate interest in verifying Sosa's medical condition at that point to determine what, if any, accommodation was required. See Delson v. Mineta, 144 F. App'x 136, 138 (2d Cir. 2005) (summary order) ("In seeking to determine the extent and types of accommodation that were truly necessary for plaintiff, the defendant's inquiries were 'job-related and consistent with business necessity.'") (citation omitted).

11. The court notes that the referral to the medical examination itself is not a materially adverse employment event. Dimitracopoulos v. City of New York, 26 F. Supp. 3d 200, 213 (/case/dimitracopoulos-v-city-of-ny-1#p213) (E.D.N.Y. 2014) (finding that a "one-time referral to a medical examination is not grounds for a claim of age discrimination . . ."); Kane v. Carmel Cent. Sch. Dist., No. 12-CV-5429 (VB), 2014 WL 7389438, at *8 (S.D.N.Y. Dec. 15, 2014) ("After plaintiff fell getting into her car, the District was certainly entitled to require plaintiff to undergo a Section 913 examination. Requiring plaintiff to submit to a medical examination the District is statutorily empowered to mandate does not materially alter the terms and conditions of plaintiff's employment, and is not more disruptive than a mere inconvenience.").

DHR's decision to place Sosa on unpaid leave after she failed to appear at a required medical examination was legitimate and non-discriminatory. See Johnson v. Goodwill Indus. of E. N.C., Inc., No. 97-CV-740 (BR), 1998 WL 1119856, at *4 (E.D.N.C. Dec. 17, 1998) ("Several courts have held that an employee's refusal to submit to a job-related medical exam is proper grounds for termination.")

Sosa responds that she did not refuse the medical examination, but instead relied on the advice of her counsel who informed her that she did not need to attend the examination. (Sosa's 56.1 ¶¶ 23, 24; Sosa Dep. at 12:6-14, 285:8-286-21.) This argument misses the mark. The question the court needs to answer is not whether Sosa had valid grounds to miss the medical examination, but whether the employer's decision to place her on unpaid leave and then terminate her employment was discrimination solely based on her disability. Sosa may well have had a valid reason for missing the medical examination, but absent evidence that Sosa was discriminated against because of her disability, those reasons are irrelevant. There is simply no record evidence that suggests that DHR's decision to place Sosa on involuntary leave and then terminate her employment was pretextual.

## B. Hostile Work Environment

"To withstand summary judgment, a plaintiff must demonstrate either that a single incident was extraordinarily severe, or that a series of incidents were sufficiently continuous and concerted to have altered the conditions of her working environment." Solomon v. Southampton *21 Union Free Sch. Dist., 504 F. App'x 60, 61 (/case/solomon-v-southampton-union-free-sch-dist#p61) (2d Cir. 2012) (summary order) (quoting Feingold v. New York, 366 F.3d 138, 149-50 (/case/feingold-v-new-york#p149) (2d Cir. 2004).)

Here, interpreting the record in a light most favorable to Sosa, the following events could arguably form part of the basis for a hostile work environment claim: (1) Sosa was "frequently" unable to leave her office and forced to cancel medical appointments because she was required to supervise the office (Sosa's 56.1 ¶ 8; Sosa Dep. at 211:2-5); (2) OSHI remained understaffed despite Sosa's requests for help (id. at 183:18-25); (3) Yearwood-Drury failed to submit Sosa's timesheet in a timely manner (id. at 207:8-208:24); (4) Yearwood-Drury accused Sosa of "nickel and diming" the timesheets of one of Sosa's inferiors (id. at 154:13-155:3); (5) Feldstein—another OSHI employee—brandished a stapler at Sosa (id. at 199:12-21); (6) Yearwood-Drury did not sufficiently respond when Sosa alleged that Feldstein was harassing her (id. at 122:16-25); (7) Yearwood-Drury inquired into Sosa's timesheets (id. at 208:7-22); (8) Yearwood-Drury accused Sosa of not being honest about her disability (id. at 92:25-93:14); (9) Yearwood-Drury allowed her cell phone to ring, laughed, and conversed during Sosa's HRS II interview (Sosa's 56.1 ¶15).

On this evidence, a reasonable jury could not find in Sosa's favor for two reasons: first, she has not linked any hostility to her disability, and second, any remaining allegations are simply not severe or pervasive enough to create an objectively hostile or abusive work environment.

It is "axiomatic" that in order to establish a claim of hostile work environment, a plaintiff must link the hostile conduct to her protected class. Alfano v. Constello, 294 F.3d 365, 374 (/case/alfano-v-costello#p374) (2d Cir. 2002). This does not mean that a plaintiff needs direct evidence that her protected status was the cause of each discreet injustice. "Facially neutral incidents" may be considered as part *22 of a hostile work environment claim "so long as a reasonable fact-finder could conclude that they were, in fact, based on [the protected status]. But this requires some circumstantial or other basis for inferring that incidents [ability]-neutral on their face were in fact discriminatory." Id. at 378. In the end, "a fact-finder may consider only abusive conduct proven to be" based on disability. Pucino v. Verizon Wireless Commc'ns, Inc., 618 F.3d 112, 117 (/case/pucino-v-verizon-communications-inc#p117) (2d Cir. 2010). For much of the hostile conduct Sosa alleges, there is simply no nexus between the alleged hostility and her disability.

As a preliminary matter, Sosa has not put forth direct evidence of discrimination on the basis of disability. Arguably, the closest she gets to alleging that OSHI was a hostile work environment for individuals with disability is her claim that Yearwood-Drury disparaged another disabled employee named Cynthia. (Sosa Dep. at 111:10-21.) But even there, Sosa concedes, "I don't know if shy [sic] knows of any disability that Cynthia may have . . . ." (Id. at 111:11-13.) Sosa has not adduced direct evidence of discrimination with regard to any other of the allegedly hostile conduct.

Nor has Sosa adduced circumstantial evidence that facially neutral conduct was related to her disability. For example, Sosa alleges that Yearwood-Drury did not appropriately respond when Feldstein threatened her; but Sosa testified also that Yearwood-Drury's response "doesn't tie into the disability." (Id. at 200:6-8.) Additionally, Sosa testified that despite their disagreements, Yearwood-Drury was "always fair" to her. (Id. at 248:24-249:3.) Likewise, the record contains no evidence that Feldstein threatened Sosa with a stapler because of her disability. Instead, Sosa herself stated that Feldstein was known to have behavioral issues. (Id. at 122:16-25, 199:16-22.) Moreover, when asked if she believed that Feldstein's conduct was related to her disability, all Sosa could state was that Feldstein knew that she had fallen. (Id. *23 at 199:25.) Sosa's own speculation is an insufficient nexus to make out a hostile work environment claim.

Even if Sosa had adduced evidence that her mistreatment was linked to her disability, her allegations are simply not objectively substantial enough to constitute a hostile work environment.

Many of Sosa's allegations reduce down to a claim that Yearwood-Drury subjected her to intense scrutiny, for example, by questioning her injury and timesheets. Claims of intense scrutiny, even when coupled with additional conduct, have been found insufficient to create a hostile work environment. Nugent v. St. Lukes-Roosevelt Hosp. Ctr., 303 F. App'x 943, 945 (2d Cir. 2008) (summary order). Moreover, Sosa admitted that reviewing timesheets for accuracy was part of a supervisor's job at OSHI and could take a substantial amount of time. (Sosa Dep. at 155:5-16.) Sosa's claims that Yearwood-Drury stood by as other employees harassed Sosa are belied by the record. Sosa testified that "she had verbal warnings in front of me, but I felt that it should have been taken a step further, and I don't know if Joyce ever did that." (Id. at 123:18-22.) Finally, Sosa's allegation that Yearwood-Drury was rude during her HRS II interview is not severe enough to make out a claim for a hostile workplace. See Faragher v. City of Boca Raton, 524 U.S. 775, 788 (/case/faragher-v-city-of-boca-raton#p788) (1998) (noting that anti-discrimination law should not be read so broadly to create a "general civility code").

Accordingly, the court finds that a reasonable jury could not find in Sosa's favor on her hostile work environment claim.

## C. Reasonable Accommodation

In order to make out a prima facie case of failure to accommodate a plaintiff must show: "(1) [P]laintiff is a person with a disability . . . ; (2) an employer covered by the statute had ·24 notice of his disability; (3) with reasonable accommodation, plaintiff could perform the essential functions of the job at issue; and (4) the employer has refused to make such accommodations." McBride v. BIC Consumer Prods. Mfg. Co., 583 F.3d 92, 97 (/case/mcbride-v-bic-consumer-prd#p97) (2d Cir. 2009) (quoting Graves v. Finch Pruyn & Co., 457 F.3d 181, 184 (/case/graves-v-finch-pruyn-co-inc#p184) (2d Cir. 2006)). Sosa cannot make out a prima facie claim of failure to accommodate.[12] (/case/sosa-v-ny-state-div-of-human-rights#idm140649933277168)

> 12. Defendants argue that the failure to accommodate claim was not properly raised. (Reply Mem. in Further Support of Def.'s Mot. for Summ. J. (Dkt. 80) at 7-8.) The court need not reach this question because of its disposition on the merits.

Sosa admitted in her deposition testimony that with one exception all of her requests for accommodation were granted.

> Q: Were there any instances where you requested some type of accommodation and didn't get the assistance you requested?
>
> A: I think the only time that I could think of that she was going to give me a hard time that month that I asked, February 2009 that month that I had asked for the month off, and it was granted to me as workers compensation leave. So she - in two instances where I had to send her a letter asking her to use whatever unused vacation or unused sick leave for giving her permission to go on the computer and use it up because of the month that I am taking off, she was quite derogatory and — in saying that she didn't think that I was being truthful, and that I am up to something.

(Sosa Dep. (Rebuttal Affirmation of Michelle R. Lambert in Support of Def.'s Mot. Summ. J. (Dkt. 81), Ex. F (Dkt. 81-2) at 192:3-21.) Even if Yearwood-Drury was less than forthcoming in granting Sosa's request to take off February of 2009, her leave was ultimately granted. (Id. at 92:25-93:4 ("I remember in February of 2009 when I was out for a month.").)[13] (/case/sosa-v-ny-state-div-of-human-rights#idm140649931853680) Sosa's admission that all of her requested accommodations were granted is supported by the remainder of the record. For instance, Sosa occasionally asked Yearwood-Drury for help because she was not feeling well. (Id. at 191:11-24.) In each instance, Sosa testified that Yearwood-Drury would ·25 help. (Id. at 191:24-192-2.) Accordingly, Sosa cannot make out a claim for failure to accommodate.

13. Sosa appears to have asked for an in-office printer as well. (See Feb. 5, 2009, Fax from Sosa to Yearwod-Drury (Sosa Aff. Ex. Q (Dkt. 79-17)0 at 2.) This request was explicitly framed as an alternative request to receiving leave. As explained above, Sosa was granted leave in February 2009. --------

# IV. CONCLUSION

For the reasons stated above, DHR's motion for summary judgment is GRANTED and all claims against DHR are DISMISSED WITH PREJUDICE. The Clerk of Court is respectfully directed to enter judgment and to close the case.

SO ORDERED.

**s/Nicholas G. Garaufis**


NICHOLAS G. GARAUFIS


United States District Judge

Dated: Brooklyn, New York


September 3, 2015

---

Contact (mailto:contact@casetext.com)   Features (/features)   Pricing (/pricing)   Terms (/terms) (https://twitter.com/casetext)
Privacy (/privacy)   About (/about)   Jobs (/jobs)   Press (/about#press)   Students (/students)

(https://www.facebook.com/casetext)

© 2017 Casetext, Inc.
Casetext, Inc. and Casetext are not attorneys or a law firm and do not provide legal advice.

UNITED STATES DISTRICT COURT SOUTHERN DISTRICT OF NEW YORK

15 Civ. 4578 (KPF) (S.D.N.Y. Jul. 21, 2016)

# ⊞ MOORE V. CITY OF N.Y.



---

KATHERINE POLK FAILLA, District Judge

## OPINION AND ORDER

KATHERINE POLK FAILLA, District Judge:

On June 9, 2015, Plaintiff Carmen D. Moore ("Moore" or "Plaintiff") initiated this action against her former employer, the City of New York ("Defendant" or the "City").[1] (/case/moore-v-city-of-ny-7#idm139929682924576) Plaintiff asserts claims of disability-based discrimination in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e to 2000e (/statute/42-usc-2000e-definitions)-17; the Americans with Disabilities Act of 1990, 42 U.S.C. §§ 12112 to 12117 (/statute/42-usc-12112-discrimination) (the "ADA"); the New York State Human Rights Law, N.Y. Exec. Law §§ 290 to 297 (the "NYSHRL"); and the New York City Human Rights Law, N.Y. City Admin. Code §§ 8-101 to 8-131 (the "NYCHRL"). Presently before the Court is Defendant's motion for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure. For the reasons discussed in the remainder of this Opinion, Plaintiff's federal claims are dismissed with *2 prejudice, and her non-federal claims are dismissed without prejudice to permit their refiling in state court.

1. Plaintiff was employed by the New York City Police Department (the "NYPD"), a "non-suable agency of the City [of New York]." *Jenkins* v. *City of New York*, 478 F.3d 76, 93 (/case/jenkins-v-city-of-new-york#p93) n.19 (2d Cir. 2007).

## BACKGROUND

2. ² (/case/moore-v-city-of-ny-7#idm139929686937248) When assessing a motion for judgment on the pleadings pursuant to Federal Rule of Civil Procedure 12(c), the court considers "the complaint, the answer, any written documents attached to them, and any matter of which the court can take judicial notice for the factual background of the case." *Roberts v. Babkiewicz*, 582 F.3d 418, 419 (/case/roberts-v-babkiewicz-2#p419) (2d Cir. 2009) (per curiam) (citation omitted). For the purposes of a Rule 12(c) motion, the complaint is "deemed to include any written instrument attached to it as an exhibit, materials incorporated in it by reference, and documents that, although not incorporated by reference, are 'integral' to the complaint." *L-7 Designs, Inc. v. Old Navy, LLC*, 647 F.3d 419, 422 (/case/l-7-designs-inc-v-old-navy-llc#p422) (2d Cir. 2011) (internal quotation marks omitted) (quoting *Sira v. Morton*, 380 F.3d 57, 67 (/case/sira-v-morton-2#p67) (2d Cir. 2004)). The facts alleged herein are drawn from Plaintiff's Complaint, and the documents attached thereto (abbreviated as "Compl.," and cited using the page numbers assigned by the Court's electronic case filing ("ECF") system) (Dkt. #1), and Defendant's Answer ("Answer"), and the exhibits attached thereto (Dkt. #22) (abbreviated as "Ex.," and cited using the ECF page numbers, except for the transcript included at Exhibit L, which is cited using the transcript page numbers). For convenience, Defendant's Memorandum of Law will be referred to as "Def. Br." (Dkt. #25); Plaintiff's Opposition as "Pl. Opp." (Dkt. #28); and Defendant's Reply as "Def. Reply" (Dkt. #29).

# A. Factual Background

## 1. Plaintiff's Employment as a Traffic Enforcement Agent

Beginning in October 1988, Plaintiff was employed by the NYPD as a Traffic Enforcement Agent I ("TEA I"). (Compl. 9). Plaintiff's responsibilities as a TEA I included "patrol[ing] an assigned area," as well as "prepar[ing] and issu[ing] paper and electronic summonses." (Answer, Ex. K). Plaintiff was required to "work[] outdoors in all kinds of weather and patrol[] on foot for long periods of time." (*Id.*).

Plaintiff claims that, beginning at least as early as 2005, she was beset with a series of mental and emotional infirmities that amounted to a disability. (*See, e.g.*, Pl. Opp. 12). Plaintiff attempted to continue working at the NYPD ·3 through what she terms its "working while disabled" program (*id.*), but found that the TEA job "incapacitate[d her] mentally" (*id.* at 13). According to Plaintiff, her last day of work before commencing disability leave was December 28, 2009. (Answer, Ex. C at 3).

## 2. Plaintiff's Charge of Discrimination Based on Her Disability

On July 18, 2011, Plaintiff filed a Charge of Discrimination (the "EEOC Charge") with the Equal Employment Opportunity Commission (the "EEOC") and the New York State Division of Human Rights (the "NYSDHR"),³ (/case/moore-v-city-of-ny-7#idm139929687971408) stating that she had been discriminated against on the basis of disability. (Compl. 9). In broad summary, Plaintiff claimed that (i) she had been diagnosed with a variety of mental conditions, including in particular post-traumatic stress disorder; (ii) prior to going out on medical leave, she had been posted to a position at the NYPD's Bronx Tow Pound that involved "indoor clerical responsibilities" (*id.* at 7, 9); (iii) she sought to return from medical leave to the

position at the Tow Pound, which she described as a "reasonable accommodation" (id. at 9); and (iv) "[o]n May 4, 2011, without any interactive discussion, [the] NYPD denied my request for a reasonable accommodation" (id.). [4]

> 3. "In New York, a charge of discrimination may be filed with either the EEOC or the New York State Division of Human Rights. Moreover, based upon a worksharing agreement between the EEOC and the NYSDHR, charges received by the Human Rights Division are automatically deemed dual-filed with the EEOC." *Campbell v. County of Onondaga*, No. 5:04-CV-1007 (NAM) (GHL), 2009 WL 3163498, at *11 (N.D.N.Y. Sept. 29, 2009) (citations omitted).

On September 24, 2014, after an investigation, the EEOC issued its determination on the merits of Plaintiff's EEOC Charge. (Compl. 7-8). It deemed Plaintiff "disabled as defined by the [ADA Amendments Act of 2008]," and further found that Defendant had "failed to provide the reasonable accommodation it had previously granted to [Plaintiff], despite substantial medical documentation[.]" (Id. at 7-8). The EEOC concluded that "there [was] reasonable cause to believe that Respondent ha[d] discriminated against [Plaintiff] on account of her disability." (Id. at 7).

The EEOC subsequently referred Plaintiff's matter to the Department of Justice (the "DOJ") for investigation. (Compl. 5). At the conclusion of its investigation, the United States Attorney's Office for the Southern District of New York sent Plaintiff, via her attorney, a letter, dated February 27, 2015, announcing the DOJ's decision not to file suit and providing Plaintiff with notice of her right to sue within 90 days. (Id. at 5-6). The DOJ did not make a judgment as to the merits of Plaintiff's case. (Id. at 5).

### 3. Plaintiff's Application for Retirement

Plaintiff did not remain an active member of the NYPD during the pendency of the EEOC investigation. Instead, one month after filing her EEOC Charge, on August 10, 2011, Plaintiff filed a Report of Personal Disability with the New York City Employees' Retirement System ("NYCERS"); in it, she stated that she was "incapacitated for further service" as a TEA I because of "mental [and] psychological conditions." (Answer, Ex. B). On November 1, 2011, Plaintiff completed a Questionnaire for Disability Retirement. (Id., Ex. C). She [5] indicated that her application was based on several disabling conditions, including "severe depression, panic attacks, post tra[u]matic stress, [and] anxiety." (Id. at 2). Plaintiff attested that her work as a TEA I included "[w]orking outdoors" and "[w]alking," as well as "interaction and confrontations with [the] public." (Id. at 3). She further alleged that she was "totally and permanently disabled from performing the usual duties of [her] title," and was not able to perform any other work. (Id.).

As an additional component of her disability retirement application, Plaintiff included Reports of Disability from two of her treating physicians, Dr. Charles Robins and Dr. Lauralyn Fredrickson. (Answer, Ex. D). Dr. Robins diagnosed Plaintiff with "PTSD from being assaulted on [the] job" and dysthymia,[4] (/case/moore-v-city-of-ny-7#idm139929694157664) as a result of her "severe hyposomnia," "psychomotor retardation," and "panic attacks." (*Id.* at 2).[5] (/case/moore-v-city-of-ny-7#idm139929684344304) Dr. Robins did not indicate a specific date on which Plaintiff could return to the full duties of her job, but reported generally that she was "unable to work." (*Id.*). Dr. Fredrickson diagnosed Plaintiff with chronic post-traumatic stress disorder, recurrent major depression, and panic, stemming from her "[i]nsomnia, [f]lashbacks, anxiety, nightmares, [p]anic attacks, [and] depressed mood." (*Id.* at 4). Like Dr. Robins, Dr. Frederickson deemed Plaintiff "unable to return to [her] duties." (*Id.*). [6]

4. Dysthymia is synonymous with persistent depressive disorder, a chronic form of depression. *Persistent depressive disorder (dysthymia)*, Mayo Clinic, http://www.mayoclinic.org/diseases-conditions/persistent-depressive-disorder/home/ovc-20166590 (last visited July 20, 2016).

5. The information contained in the Report of Disability form signed by Dr. Robins has been entered by at least two individuals, but the Court will accept for purposes of this motion that all of the information in the report comes from Dr. Robins.

Subsequent to Plaintiff's submission of her disability retirement application, she appeared for an examination and interview before NYCERS' Medical Board on January 5, 2012. (Answer, Ex. E (report of interview)). During the interview, Plaintiff stated that she was "unable to resume work because she d[id] not want to be with people, she d[id] not trust people and she hardly ever [left] her home." (*Id.* at 4). The Medical Board concluded that Plaintiff was disabled for the purposes of performing the duties of a TEA I, and recommended that she be approved for disability retirement for a period of one year. (*Id.*). The Medical Board requested that Plaintiff be reevaluated after the year elapsed, and that she be reexamined by a NYCERS psychiatric consultant beforehand. (*Id.*). The Medical Board ultimately diagnosed Plaintiff with recurrent depressive disorder. (*Id.*).

On January 13, 2012, NYCERS sent a letter to Plaintiff conveying that her application for disability retirement had been approved, and explaining that she had to reappear before the Medical Board the following year. (Answer, Ex. F). Two months later, on March 8, 2012, NYCERS sent another letter to Plaintiff, reporting that the Board of Trustees had adopted the Medical Board's recommendation regarding Plaintiff's application for disability retirement. (*Id.*, Ex. G). Plaintiff's date of retirement was set as September 9, 2011. (*Id.*).

In compliance with the Medical Board's directive, Plaintiff reappeared before it on September 3, 2013. (Answer, Ex. H). During her interview, Plaintiff stated that she was "unable to perform her duties as a [TEA I] because she tried to go back many times and she just [could not] do it." (*Id.* at 3). *7 Additionally, Plaintiff reported that "she was struck by someone" on the job, and was "very fearful" and "d[id] not go outside the house much." (*Id.*). In response to "clinical and documentary evidence," the Medical Board once again found Plaintiff disabled, and recommended that Plaintiff's disability retirement application be approved. (*Id.* at 4). Based on the interview and examination, the Medical Board diagnosed Plaintiff with depression. (*Id.*).

# B. Procedural Background

Plaintiff filed the instant Complaint on June 9, 2015. (Compl. 1). On December 1, 2015, the Court held a pre-motion conference with the parties to discuss a motion to dismiss that Defendant had expressed its intent to file. (*See* Answer, Ex. L (transcript of conference)). In response to clarifying questions from the Court, Plaintiff attested that her former attorney initially received the right-to-sue letter from the EEOC; however, she was unsure as to the exact date on which it was received. (*Id.* at 5:2-6). Plaintiff stated that upon his receipt of the right-to-sue letter, her then-attorney "put [her] on a conference call" and informed her of the letter's existence. (*Id.* at 5:6-20). Plaintiff was unable to recall the precise date of this telephone conference. (*Id.* at 5:21-6:13). Plaintiff indicated that, with her knowledge and assent, her attorney subsequently entered into settlement negotiations with the NYPD to forestall litigation. (*Id.* at 4:7-14). Plaintiff reported that she ultimately disagreed with the NYPD's proposal to resolve the case, at which time her attorney advised her that he could no longer act as her counsel. (*Id.* at 4:1-22, 7:13-8:10). *8

During the conference, Plaintiff presented the Court with a letter from her former attorney, dated March 6, 2015. (Answer, Ex. L at 14:4-6). This letter enclosed the right-to-sue letter. (*Id.*). The post-marked envelope indicated that Plaintiff's former attorney sent her these letters on March 18, 2015. (*Id.* at 14:1-3). Plaintiff claimed she received them on March 20, pursuant to a handwritten notation she made on the mailing envelope. (*Id.*).

Additionally, Plaintiff provided further detail concerning the reasonable accommodation she had sought. She explained that she came to be assigned to the Bronx Tow Pound when she started "having a lot of medical stuff going on mentally" and "found out that [she] could not work in the streets" following the assault. (Answer, Ex. L at 9:4-13). Plaintiff recalled "having panic attacks out in the streets and anxiety." (*Id.*

7/3/2017
Moore v. City of N.Y., 15 Civ. 4578 (KPF) (S.D.N.Y. Jul. 21, 2016) | Casetext
Case 1:17-cv-02216-VEC Document 10-1 Filed 07/03/17 Page 29 of 39

at 9:16-17). As a result, Plaintiff's doctors wrote letters on her behalf advising the NYPD that her medical conditions precluded her from continuing to work outside as a TEA I. (*Id.* at 9:15-18). According to Plaintiff, a police chief at One Police Plaza approved her reassignment to the Bronx Tow Pound. (*Id.* at 9:20-10:1).

Plaintiff confirmed for the Court that she eventually ceased working at the Bronx Tow Pound as a result of her illness. (Answer, Ex. L. at 10:2-4). When Plaintiff sought to return to work with the NYPD after her illness had subsided, the commanding officer at the Bronx Tow Pound wrote a letter on Plaintiff's behalf requesting that she return to work at that site. (*Id.* at 10:5-17). Plaintiff claimed that she "went to [the commanding officer] personally" to *9 request that she return to the Tow Pound, and he expressed willingness to reinstate her to her previous position. (*Id.*).

Moving forward in the chronology of events, Plaintiff detailed her attempts to speak with the commanding officer responsible for assigning employees in the traffic department regarding her desire to return to the Bronx Tow Pound. (Answer, Ex. L at 11:4-12:6). Plaintiff claimed that the commanding officer "would not talk to [Plaintiff] because [she] got upset, and [she] was crying[.]" (*Id.* at 11:14-15). Plaintiff stated that she was eventually sent to the 34th Street command, and was told that she had to "go back in the streets." (*Id.* at 12:1-16). Plaintiff indicated to the Court that she attempted to return to work as a TEA I; however, she was unable to remain in this position due to her mental health issues. (*Id.* at 12:19-25).

In response to Plaintiff's representations regarding her and her former attorney's receipt of the right-to-sue letter, Defendant indicated its intent to challenge Plaintiff's federal claims on the grounds that her complaint had not been filed in a timely manner. (Answer, Ex. L at 14:24-15:14). The Court explained to Plaintiff that if Defendant prevailed on its motion with respect to the timeliness issue, the Court would be required to dismiss her federal claims. (*Id.* at 23:5-16). The Court further noted that Defendant's success on the timeliness issue would not vitiate Plaintiff's state and local claims; however, these pendent claims would likely need to be renewed in state court. (*Id.* at 23:17-24:4). The Court also accentuated the fact that the EEOC determined in its letter that the NYPD failed to provide the reasonable accommodation that it *10 had previously granted to Plaintiff, and therefore there was a possibility that Plaintiff could succeed on the merits of her case. (*Id.* at 17:9-16).

Defendant ultimately filed its motion to dismiss on February 1, 2016. (Dkt. #23-27). Plaintiff submitted her opposition to Defendant's motion on April 15, 2016. (Dkt. #28). Defendant concluded the briefing with the filing of its reply on April 26, 2016. (Dkt. #29).

# DISCUSSION

# A. Applicable Law

## 1. Motions to Dismiss Under Fed. R. Civ. P. 12(b)(1)

Defendant refers in its motion to both Rule 12(b)(1) and Rule 12(b)(6) of the Federal Rules of Civil Procedure, and so the Court will discuss both provisions. Under Federal Rule of Civil Procedure 12(b)(1), dismissal of a case is warranted "when the district court lacks the statutory or constitutional power to adjudicate it." *Makarova* v. *United States*, 201 F.3d 110, 113 (/case/makarova-v-us#p113) (2d Cir. 2000). A "plaintiff asserting subject matter jurisdiction has the burden of proving by a preponderance of the evidence that it exists." *Id.* In resolving a Rule 12(b)(1) motion to dismiss, "[t]he court must take all facts alleged in the complaint as true and draw all reasonable inferences in favor of [the] plaintiff, but jurisdiction must be shown affirmatively, and that showing [may] not [be] made by drawing from the pleadings inferences favorable to the party asserting it." *Morrison* v. *Nat'l Austl. Bank Ltd.*, 547 F.3d 167, 170 (/case/morrison-v-national-australia-bank-2#p170) (2d Cir. 2008) (internal citation and quotation marks omitted). Moreover, where subject matter jurisdiction is contested, a district court is permitted to consider n evidence outside the pleadings, such as affidavits and exhibits. *See Zappia Middle East Constr. Co.* v. *Emirate of Abu Dhabi*, 215 F.3d 247, 253 (/case/zappia-mid-e-cons-v-emirate-abu-dhabi#p253) (2d Cir. 2000); *accord Tandon* v. *Captain's Cove Marina of Bridgeport, Inc.*, 752 F.3d 239, 243 (/case/tandon-v-captains-cove-marina-of-bridgeport-inc#p243) (2d Cir. 2014).

## 2. Motion for Judgment on the Pleadings Under Fed. R. Civ. P. 12(c)

"The standard for granting a Rule 12(c) motion for judgment on the pleadings is identical to that of a Rule 12(b)(6) motion for failure to state a claim." *Patel* v. *Contemporary Classics of Beverly Hills*, 259 F.3d 123, 126 (/case/patel-v-contemporary-classics-of-bev-hills#p126) (2d Cir. 2001) (collecting cases); *accord Sewell* v. *Bernardin*, 795 F.3d 337, 339 (/case/sewell-v-bernardin#p339) n.3 (2d Cir. 2015). In considering a motion for judgment on the pleadings, a court must "draw all reasonable inferences in [the plaintiff's] favor, assume all well-pleaded factual allegations to be true, and determine whether they plausibly give rise to an entitlement to relief." *Faber* v. *Metro. Life Ins. Co.*, 648 F.3d 98, 104 (/case/faber-v-metropolitan-life-ins-co#p104) (2d Cir. 2011) (internal quotation marks omitted). Accordingly, a plaintiff's complaint must contain "enough facts to state a claim to relief that is plausible on its face" and must sufficiently "nudge[] [its] claims across the line from conceivable to plausible." *Bell Atl. Corp.* v. *Twombly*, 550 U.S. 544, 570 (/case/bell-atl-corp-v-twombly#p570) (2007); *see also Ashcroft* v. *Iqbal*, 556 U.S. 662, 678 (/case/ashcroft-v-iqbal-4#p678) (2009) ("The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer

possibility that a defendant has acted unlawfully." (quoting *Twombly*)). A court is not, however, obligated to accept "conclusory allegations or legal conclusions [12] masquerading as factual conclusions." *Rolon* v. *Henneman*, 517 F.3d 140, 149 (/case/rolon-v-henneman-2#p149) (2d Cir. 2008) (internal quotations omitted).

## 3. Consideration of Submissions from *Pro Se* Plaintiffs

When ruling on a motion to dismiss a *pro se* plaintiff's complaint, district courts are instructed to "construe the complaint broadly, and interpret it to raise the strongest arguments that it suggests." *Weixel* v. *Board of Educ. of City of New York*, 287 F.3d 138, 145-46 (/case/weixel-v-board-of-educ-of-city-of-new-york#p145) (2d Cir. 2002) (internal quotation marks and alterations omitted).[6] (/case/moore-v-city-of-ny-7#idm139929673834768) It is well established that "a *pro se* complaint, however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers." *Erickson* v. *Pardus*, 551 U.S. 89, 94 (/case/erickson-v-pardus-4#p94) (2007) (per curiam) (internal citation and quotation marks omitted). Nonetheless, a *pro se* plaintiff's factual allegations must be at least "enough to raise a right to relief above the speculative level" to survive a motion to dismiss. *Twombly*, 550 U.S. at 555 (/case/bell-atl-corp-v-twombly#p555). Moreover,

> 6.  Indeed, without concluding that this action must be undertaken in all *pro se* cases, the Court has considered facts presented for the first time in Plaintiff's opposition papers in resolving the instant motion. *Cf.* *Williams* v. *Correction Officer Priatno*, — F.3d —, No. 14-4777-cv, 2016 WL 3729383, at *2 (/case/williams-v-corr-priatno#p2) n.1 (2d Cir. July 12, 2016) ("Some allegations concerning the circumstances of Williams's attempted filing of his grievance are taken from his pro se opposition to the motion to dismiss, which we may consider in resolving this appeal." (citations omitted)).

while this special leniency may somewhat loosen the procedural rules governing the form of pleadings (as the Second Circuit very recently observed), it does not completely relieve a *pro se* plaintiff of the duty to satisfy the pleading standards set forth in Rules 8, 10 and 12. Rather, as both the Supreme Court and Second Circuit have repeatedly recognized, the requirements set forth in Rules 8, 10 and 12 are procedural rules that even *pro se* civil rights plaintiffs must follow. Stated more

plainly, when a plaintiff is proceeding *pro se*, "all normal rules of pleading are not absolutely suspended."

*Dallio* v. *Hebert*, 678 F. Supp. 2d 35, 55-56 (/case/dallio-v-hebert-2#p55) (N.D.N.Y. 2009) (internal citations and footnotes omitted).

# B. Discussion

## 1. Plaintiff May Not Bring Her Disability Discrimination Claim Under Title VII

Plaintiff's Title VII claim can be rejected in short order. The Title VII statute prohibits discrimination in, among other things, the terms and conditions of employment based on an individual's race, color, religion, sex, or national origin. 42 U.S.C. § 2000e-2(a)(1) (/statute/42-usc-2000e-definitions). It does not, however, bar disability discrimination. *See Risco* v. *McHugh*, 868 F. Supp. 2d 75, 107 (/case/risco-v-mchugh#p107) (S.D.N.Y. 2012) (citing *Prince* v. *Westchester Cty. Dept. of Health*, No. 90 Civ. 2506 (TPG), 1992 WL 123170, at *4 (S.D.N.Y. May 27, 1992)); *see also* 42 U.S.C. § 12101(a)(4) (/statute/42-usc-12101-findings-and-purpose) (finding by Congress that passage of ADA was necessary because "unlike individuals who have experienced discrimination on the basis of race, color, sex, national origin, religion, or age, individuals who have experienced discrimination on the basis of disability have often had no legal recourse to redress such discrimination"). In her complaint, Plaintiff alleges discrimination solely on the basis of disability, and makes no claims involving any of the protected classes that are within the scope of Title VII. (Compl. 3). Accordingly, Plaintiff's Title VII claim must be dismissed. [14]

## 2. Plaintiff's Title VII and ADA Claims Must Be Dismissed As Untimely

A second basis exists for dismissal of Plaintiff's Title VII claim, and this basis is equally applicable to Plaintiff's other federal claim, which is brought under the ADA: Defendant is correct that Plaintiff did not file her complaint within the requisite time frame provided by Title VII and the ADA, and has provided no basis for the extraordinary remedy of equitable tolling, and thus her federal claims under those two statutes must be dismissed. (*See* Def. Br. 7-8).

## a. Plaintiff's Complaint Was Filed Outside the 90-Day Limitations Period

A plaintiff asserting a claim under Title VII or the ADA must file her complaint within 90 days of receiving the right-to-sue letter. *See, e.g., Wynder* v. *McMahon*, 360 F.3d 73, 76 (/case/wynder-v-mcmahon#p76) (2d Cir. 2004) (citation omitted) (Title VII); *Johnson* v. *St. Barnabas Nursing Home*, 368 F. App'x 246, 247-48 (/case/johnson-v-st-barnabas-nursing-home-2#p247) (2d Cir. 2010) (summary order) (Title VII and ADA); *see also* 42 U.S.C. § 2000e-5(f)(1) (/statute/42-usc-2000e-definitions) (setting forth the 90-day limitations period under Title VII); *id.* § 12117(a) (extending the Title VII time limitation to the ADA). A plaintiff's failure to file a claim within the time limits set by Title VII or the ADA will ordinarily preclude her from pursuing that claim in federal court, and can warrant dismissal pursuant to Federal Rule of Civil Procedure 12(b)(6). *See generally Frederick* v. *Jetblue Airways Corp.*, No. 14 Civ. 7238 (DLI), 2016 WL 1306535, at *3-4 (E.D.N.Y. Mar. 31, 2016) (concluding that the applicable rule is Fed. R. Civ. P. 12(b)(6), and not Fed. R. Civ. P.

12(b)(1)). That said, the filing requirements [15] of Title VII and the ADA are *not* jurisdictional and, like statutes of limitations, are subject to equitable tolling. *See, e.g., Zerilli-Edelglass* v. *N.Y.C. Transit Auth.*, 333 F.3d 74, 80 (/case/zerilli-edelglass-v-nyc-transit-authority-3#p80) (2d Cir. 2003), *as amended* (July 29, 2003).

The Second Circuit has concluded that the 90-day period "begins to run on the date that a right-to-sue letter is first received *either by the claimant or by the claimant's counsel, whichever is earlier.*" *Tiberio* v. *Allergy Asthma Immunology of Rochester*, 664 F.3d 35, 38 (/case/tiberio-v-allergy-asthma-immunology-of-rochester-2#p38) (2d Cir. 2011) (emphasis added). Under normal circumstances, there exists an assumption that "notice provided by a government agency has been mailed on the date shown on the notice," and "a mailed document is received three days after its mailing." *Sherlock* v. *Montefiore Med. Ctr.*, 84 F.3d 522, 525-26 (/case/sherlock-v-montefiore-medical-center#p525) (2d Cir. 1996). This presumption may be rebutted by admissible evidence that the document was not mailed, was received late, or was never received, *id.* at 526, but "[t]he mere denial of receipt does not rebut that presumption," *Meckel* v. *Continental Res. Co.*, 758 F.2d 811, 817 (/case/meckel-v-continental-resources-co#p817) (2d Cir. 1985). *See also Sherlock*, 84 F.3d at 526 (/case/sherlock-v-montefiore-medical-center#p526) ("Neither that proffer of inadmissible evidence nor [Plaintiff's] own lack of recollection sufficed to rebut the presumption that the letter had been received by February 18.").

In the instant case, the right-to-sue letter sent by the DOJ to Plaintiff's then-attorney is dated February 27, 2015. (Compl. 5). Plaintiff has not suggested, nor does anything in the record indicate, that counsel did not receive that letter within three days of that date. Plaintiff did not know when her attorney received the letter; she recalled speaking with the attorney or someone at his office "when they first received the letter," but could not recall [16] specifics. (Answer, Ex. L at 4:11-12, 5:5-6:13). Plaintiff also recalled a series of discussions with counsel during this time period regarding settlement with the City in lieu of litigation, at the end of which she rejected the settlement offer and elected to file a lawsuit without counsel. (*Id.* at 4:11-22, 6:21-8:13).

At the pre-motion conference on December 1, 2015, Plaintiff presented the Court with a letter, dated March 6, 2015, addressed to Plaintiff from her former attorney and enclosing the February 27 right-to-sue letter. (Answer, Ex. L at 13:4-14:6). Defendant argues from this that Plaintiff's counsel received the right-to-sue letter no later than March 6, 2015, such that the 90-day limitation would have elapsed on June 4, 2015. (Def. Br. 8 & n.7). Plaintiff did not file the instant action until June 9, 2015. (Compl. 1). On this record, the Court agrees that Plaintiff's federal claims under Title VII and the ADA are untimely, unless there is a basis for tolling the 90-day limitations period. The two possible bases are discussed in the remainder of this subsection.

### b. Plaintiff's Mental Illness Does Not Warrant Equitable Tolling

·Although the 90-day limit is "a statutorily-imposed requirement necessitating strict adherence," *Celestine* v. *Cold Crest Care Ctr.*, 495 F. Supp. 2d 428, 432 (/case/celestine-v-cold-crest-care-center#p432) (S.D.N.Y. 2007), equitable tolling may be warranted where (i) a party "has acted with reasonable diligence during the time period she seeks to have tolled," and (ii) the party "has proved that the circumstances are so extraordinary that the doctrine should apply," *Zerilli-Edelglass*, 333 F.3d at 80-81 (/case/zerilli-edelglass-v-nyc-transit-authority-3#p80) (citation omitted). *See also Pace* v. *DiGuglielmo*, 544 U.S. 408, 418 (/case/pace-v-diguglielmo-2#p418) (2005) ·17 (noting that a party seeking equitable tolling must demonstrate extraordinary circumstances); *see generally South* v. *Saab Cars USA, Inc.*, 28 F.3d 9, 11-12 (/case/south-v-saab-cars-usa-inc#p11) (2d Cir. 1994) (stating that grounds for equitable tolling of the 90-day limitations period for filing federal employment discrimination claims may include circumstances: (i) "where the claimant has actively pursued his judicial remedies by filing a defective pleading during the statutory period"; (ii) "where the claimant has been induced or tricked by his adversary's misconduct into allowing the filing deadline to ·pass"; (iii) "where the court has led the plaintiff to believe that she had done all that was required of her"; (iv) "where affirmative misconduct on the part of the defendant may have lulled plaintiff into inaction"; (v) "where the claimant has received inadequate notice"; and (vi) "where a motion for appointment of counsel is pending").

The Second Circuit has permitted equitable tolling in circumstances where "a plaintiff's medical condition or mental impairment prevented her from proceeding in a timely fashion." *Zerilli-Edelglass*, 333 F.3d at 80-81 (/case/zerilli-edelglass-v-nyc-transit-authority-3#p80); *see also, e.g., Brown* v. *Parkchester S. Condos.*, 287 F.3d 58 (/case/brown-v-parkchester-south-condominiums) (2d Cir. 2002). In determining whether to exercise its discretion to allow tolling based on mental illness, a court must look for a "particularized description of how [the plaintiff's] condition adversely affected her capacity to function generally or in relationship to the pursuit of her rights[.]" *Boos* v. *Runyon*, 201 F.3d 178, 185 (/case/boos-v-runyon#p185) (2d Cir. 2000); *see also id.* at 184 ("As [*Canales* v. *Sullivan*, 936 F.2d 755, 759 (/case/canales-v-sullivan-3#p759) (2d Cir. 1991),] indicates, the question of whether a person is sufficiently mentally disabled to justify tolling of a limitation period is, under the law of ·18 this Circuit, highly case-specific."). "The burden of demonstrating the appropriateness of equitable tolling, however, lies with the plaintiff." *Id.* at 185.

Here, Plaintiff admits to having "totally forgotten about the letter" because she was "going through some heavy and critical treatment that made [her] forget and made [her] brain foggy." (Pl. Opp. 6). She claims that she "could not remember one second to the next." (*Id.*). Viewing Plaintiff's *pro se* submission in the

light most favorable to her position, the Court understands Plaintiff to be arguing that she is entitled to equitable tolling because her mental infirmities prevented her from filing her complaint within the 90-day period. However, a review of the relevant materials confirms that, even crediting Plaintiff's statements regarding her then-existing mental condition, her episodes of inattention were at worst intermittent, and cannot be said to have prevented her from timely filing a complaint. *Cf. Bolarinwa* v. *Williams*, 593 F.3d 226, 232 (/case/bolarinwa-v-williams#p232) (2d Cir. 2010) (citing *Zerilli-Edelglass*, *Brown*, *Boos*, and *Canales* in support of conclusion that, "in order to justify tolling of the AEDPA one-year statute of limitations due to mental illness, a habeas petitioner must demonstrate that her particular disability constituted an 'extraordinary circumstance' severely impairing her ability to comply with the filing deadline, despite her diligent efforts to do so").

Plaintiff does provide information about the conditions with which she was diagnosed, but has not provided a "particularized description" sufficient to demonstrate that she was wholly incapable of pursuing her legal rights during the period in question. Quite to the contrary, Plaintiff acknowledged that she [19] was represented by counsel for some period of time after receiving the right-to-sue letter; there is no suggestion that counsel was laboring under any comparable impediments, and Plaintiff was lucid enough to discuss with counsel during the 90-day period both a strategy for settlement discussions with Defendant and a fallback position after Plaintiff rejected Defendant's settlement offer, the latter of which resulted in Plaintiff's ultimate decision to file the instant lawsuit *pro se*. (Answer, Ex. L at 4:7-22, 6:21-8:13). All of this suggests a lack of diligence on Plaintiff's part concerning the 90-day filing deadline. And while describing the alleged limitations caused by her illness, Plaintiff simultaneously relates that she was aware that she might have missed the deadline to file her complaint, at which point she telephoned the EEOC to inquire. (Pl. Opp. 6). Even if Plaintiff's telephone call can be considered "reasonable diligence," this affirmative act confirms that her mental infirmities were not so severe that they constituted an "extraordinary" circumstance preventing her from exercising her legal rights. Thus, the Court finds, as a matter of law, that Plaintiff is not entitled to equitable tolling based on mental illness.

### c. The Information Allegedly Provided by the EEOC Does Not Warrant Equitable Tolling

Plaintiff also suggests that her otherwise-untimely federal claims should be accepted because of information that she received from an EEOC employee whom she identifies as Mr. Perez, to the effect that the "countdown of the days" did not start until she got the right-to-sue letter "on [her] person, in [her] hand." (Opp. 6). As Plaintiff explains, she had all but forgotten about the letter [20]

[u]ntil one day I said[,] Oh my Gosh, I was suppose[d] to turn in that [paperwork] and thought I had missed the deadline. I spoke to Mr. Perez at the EEOC and counted the date down to the wire and I was safe, so my son delivered the papers by hand!

(*Id.*; *see also id.* ("I just made the deadline!")). In reply, Defendant argues that, even if Plaintiff did receive incorrect advice, she might have a claim against the EEOC, but her claim against Defendant would still be time-barred. (Def. Reply 3).

The Court considers first the legal underpinnings of Plaintiff's tolling argument. Under Second Circuit law, it is "questionable" whether the EEOC's acts warrant equitable tolling when the EEOC is not a party to a plaintiff's complaint. *See Vernon* v. *Cassadaga Valley Cent. Sch. Dist.*, 49 F.3d 886, 891 (/case/vernon-v-cassadaga-valley-cent-school-dist#p891) (2d Cir. 1995); *see also id.* (suggesting that conduct at issue should "amount to affirmative misconduct on the government's part aimed at causing [the plaintiff] to forego his legal rights" (internal quotation marks and citation omitted)); *but cf. Johnson* v. *Al Tech Specialties Steel Corp.*, 731 F.2d 143, 146 (/case/johnson-v-al-tech-specialties-steel-corp#p146) (2d Cir. 1984) (noting earlier district court decision that erroneous advice by EEOC official could warrant equitable tolling, but refraining from deciding the issue in the absence of admissible substantiation from plaintiff). Even assuming tolling would be permitted where the EEOC is not a party, "affirmative misconduct on the government's part" has been required to allow an extension of time. *Long* v. *Frank*, 22 F.3d 54, 59 (/case/long-v-frank-3#p59) (2d Cir. 1994). Plaintiff has offered no evidence indicating that the EEOC was intentionally and affirmatively taking steps to thwart her pursuit of legal recourse. [21]

More recently, several courts in this District have declined to permit equitable tolling where a plaintiff makes unsupported allegations that she received misinformation from the EEOC regarding the period in which she could file a lawsuit. *See, e.g., Tsai* v. *Rockefeller Univ.*, No. 00 Civ. 329 (SAS), 2002 WL 237843, at *4 (/case/tsai-v-rockefeller-university-2#p4) (S.D.N.Y. Feb. 15, 2002) (quoting and adopting Fifth Circuit decision that found tolling unwarranted because it would be "virtually impossible for the EEOC or a defendant to rebut a plaintiff's unsupported allegation that the EEOC provided incomplete information in a telephone conversation," given the volume of calls the EEOC receives every day), *aff'd sub nom. Li-Lan Tsai* v. *Rockefeller Univ.*, 46 F. App'x 657 (2d Cir. 2002) (summary order).

The Court acknowledges that equitable tolling has been permitted in situations where a plaintiff relied on representations made by the EEOC and the circumstances of the reliance were deemed "extraordinary." *Compare Walker* v. *Linklaters LLP*, 948 F. Supp. 2d 396, 400 (/case/walker-v-linklaters-llp#p400) (S.D.N.Y. 2013) (finding sufficient factual basis for equitable tolling in part because EEOC's alleged misinformation in the course of frequent contacts with plaintiff constituted extraordinary circumstance), *with Miller* v. *St. Luke's Roosevelt Hosp. Ctr.*, No. 15 Civ. 7019 (VEC) (GWG), 2016 WL 1275066, at *6 (S.D.N.Y. Apr. 1, 2016) (deeming non-extraordinary EEOC's potentially incorrect advice that plaintiff could wait until termination to file charge, given plaintiff's lack of diligence), *report and recommendation adopted*, 2016 WL 2939175 (S.D.N.Y. May 18, 2016); *cf. Swergold* v. *Murray*, — F. App'x —, No. 15-3905-cv, 2016 WL *22 3854441, at *1 (2d Cir. July 12, 2016) (summary order) (concluding that neither plaintiff's reliance on district court opinion in derogation of Second Circuit law nor "plaintiff's misreading of a sound district court decision" would constitute "extraordinary circumstance" justifying equitable tolling).

The Court shares the skepticism inherent in the *Vernon* and *Tsai* decisions. That said, even apart from the legal hurdles, Plaintiff has serious factual issues with this particular equitable tolling argument. For one thing, Plaintiff's timeline is not consistent: While she avers in her Complaint that she received the right-to-sue letter on March 20, 2015 (*see* Compl. 4; *see also* Answer, Ex. L at 14:2-3 (referring to Plaintiff's handwritten notation on the envelope containing the right-to-sue letter that she received it on March 20, 2015)), she maintains in her opposition papers that she received the letter on "March 22nd Saturday evening" (Pl. Opp. 6). Moreover, the Court identifies a certain illogic in Plaintiff's claim that she "just made the deadline" with a June 9, 2015 filing (*id.*), if she was in fact advised by Mr. Perez (and believed) that a receipt date of March 20 (or 22), 2015, governed the deadline for filing.

Reading Plaintiff's claims in light of the solicitude afforded *pro se* litigants, the Court has examined the purportedly erroneous advice that Plaintiff received, and has found it inadequate to support equitable tolling. Plaintiff alleges that the EEOC advised her that the 90-day period in which she could timely file began when she personally received the right-to-sue letter. (Pl. Opp. 6). As in *Miller*, there is nothing factually inaccurate or extraordinary about the EEOC's advice to Plaintiff; it is at most incomplete because it fails to *23 address receipt by counsel). Moreover, Plaintiff provides no indication in her submission that she informed the EEOC during this telephone call of her contemporaneous knowledge that her attorney had already received the right-to-sue letter, or that her attorney had been actively engaging for a period of time in settlement discussions with the NYPD in order to stave off this precise litigation. Plaintiff's apparent failure to disclose to Mr. Perez all of the circumstances surrounding her receipt of the right-to-sue letter

renders it even less likely that the statements ascribed to him could support equitable tolling of the statute of limitations. Finally, even were the Court to conclude that Mr. Perez had given erroneous advice, it would not find that equitable tolling was warranted, because the advice that he is said to have given did not cause Plaintiff to delay filing her complaint, but rather prompted her to have it hand-delivered immediately in order to "just ma[k]e the deadline." (*Id.*). In sum, considering with care all of the facts identified by Plaintiff, the Court sees no basis for equitable tolling of Plaintiff's deadline to file her Title VII and ADA claims, and Defendant's motion to dismiss is granted as to those claims.[7] (/case/moore-v-city-of-ny-7#idm139929674337632) *24

> 7. Given Plaintiff's *pro se* status, the Court considered whether to grant leave to replead. While a *pro se* complaint "should not be dismissed without granting leave to amend at least once when a liberal reading of the complaint gives any indication that a valid claim might be stated," *Shomo* v. *City of New York*, 579 F.3d 176, 183 (/case/shomo-v-city-of-new-york#p183) (2d Cir. 2009) (alterations omitted), leave to replead need not be granted where — as here — it would be "futile," *Cuoco* v. *Moritsugu*, 222 F.3d 99, 112 (/case/cuoco-v-moritsugu#p112) (2d Cir. 2000). At the pre-motion conference, the Court had extensive discussions with Plaintiff regarding the sequence of events that led to her late filing, and after considering those discussions and the content of Plaintiff's opposition submission, the Court is confident that Plaintiff has made all of the arguments regarding timeliness and tolling that this record can fairly support. --------

## 3. The Court Declines to Exercise Supplemental Jurisdiction Over Plaintiff's NYSHRL and NYCHRL Claims

A district court "may decline to exercise supplemental jurisdiction over a claim ... if ... the district court has dismissed all claims over which it has original jurisdiction." 28 U.S.C. § 1367(c) (/statute/28-usc-1367-supplemental-jurisdiction). In deciding whether to exercise supplemental jurisdiction, courts are directed to "consider and weigh in each case, and at every stage of the litigation, the values of judicial economy, convenience, fairness, and comity[.]" *Lundy* v. *Catholic Health Sys. of Long Island Inc.*, 711 F.3d 106, 117-18 (/case/lundy-v-catholic-health-sys-of-long-island-inc-2#p117) (2d Cir. 2013) (internal quotation marks omitted). "Once all federal claims have been dismissed, the balance of factors will 'usually' point toward a declination." *Id.* at 118 (brackets omitted).

In addition to her claims under federal law, Plaintiff alleges disability discrimination under NYSHRL and NYCHRL. (Compl. 1). As all of Plaintiff's federal claims have been dismissed, the Court declines to extend supplemental jurisdiction over her municipal law claims. This decision is consistent with the practice in this District, as "courts regularly decline jurisdiction over NYSHRL and NYCHRL claims once the federal employment claims have been dismissed." *Harris* v. *NYU Langone Med. Ctr.*, No. 12 Civ. 0454 (RA), 2014 WL 941821, at *2 (S.D.N.Y. Mar. 11, 2014).

Case 1:17-cv-02216-VEC   Document 10-1   Filed 07/03/17   Page 39 of 39

Having considered, without resolving the merits of, the parties' arguments, the Court recognizes the tension between certain of Plaintiff's statements to this Court and her statements to NYCERS; at the same time, the Court believes that Defendant may have too narrow a view of what a reasonable accommodation is, and when the failure to provide it can be actionable under *25 federal, state, or local law. As the Court stated in the pre-motion conference, this case is notable because the EEOC found merit to Plaintiff's claims in its September 24, 2014 letter. (*See* Compl. 7-8). Defendant advised the Court at that conference that it would not pursue mediation until the instant motion was resolved. (Answer, Ex. L at 34:8-16). In light of the Court's dismissal of Plaintiff's federal claims, and its deliberate decision not to address the merits of her claims, the parties might wish to consider mediation in conjunction with, or in lieu of, the repleading of Plaintiff's NYSHRL and NYCHRL claims in state court as the most just means to resolve this litigation.

# CONCLUSION

For the foregoing reasons, Defendant's motion is GRANTED in full. Plaintiff's claims under Title VII and the ADA are dismissed with prejudice. Because the Court declines to exercise supplemental jurisdiction over Plaintiff's NYSHRL and NYCHRL claims, they are dismissed without prejudice. The Clerk of Court is directed to terminate all pending motions, adjourn all remaining dates, and close this case.

SO ORDERED. Dated: July 21, 2016

New York, New York

/s/

KATHERINE POLK FAILLA

United States District Judge *Sent by First Class Mail to:*

Carmen D. Moore

626 Riverside Drive, Apt. 13E

New York, NY 10031

Contact (mailto:contact@casetext.com)   Features (/features)   Pricing (/pricing)   Terms (/terms)
Privacy (/privacy)   About (/about)   Jobs (/jobs)   Press (/about#press)   Students (/students)